## WOODWARD v. HURON IMPLEMENT CO.

1. APPEAL AND ERROR—REVIEW.
   In an action for fraud, commenced by writ of attachment, where the judgment of no cause of action is sustained by the appellate court, it will be unnecessary to review the action of the court below in dissolving the writ of attachment.

2. FRAUD—EVIDENCE—CLEAR WEIGHT OF EVIDENCE — FINDINGS OF COURT—REVIEW.
   In an action for fraud in the transfer of plaintiff's business, evidence examined, and *held*, that the findings of the court below were not against the clear weight of the evidence requiring a reversal of the judgment under section 12587, 3 Comp. Laws 1915.

Error to Huron; Beach, J. Submitted January 16, 1918. (Docket No. 94.) Decided March 27, 1918.

Assumpsit by Frank L. Woodward against the Huron Implement Company upon a contract alleged to have been obtained by fraud and deceit. Judgment for defendant. Plaintiff brings error. Affirmed.

*A. F. Freeman,* for appellant.

*W. T. Bope,* for appellee.

KUHN, J. Plaintiff has brought an action of assumpsit, based on alleged fraud on the part of defendant through its agents and directors, both in omitting, in connection with a certain offer submitted to plaintiff, to disclose material facts, and also in making certain promises or representations, whereby plaintiff was induced to enter into a contract arrangement with defendant, pursuant to which he transferred to it his foundry business, stock of materials, tools, etc., and received therefor $10,000 in common stock of defendant corporation and was made general manager of the combined enterprises, as a result of which fraudulent inducement, and the subsequent conduct of defendant and its agents, plaintiff has sustained the loss of the entire property invested. Plaintiff has claimed a rescission of the contract, resigned as general manager and director, tendered back his holding of stock, and seeks to recover the value of the property which he turned over to the corporation. The suit was commenced by writ of attachment, based on the ground that defendant "fraudulently contracted the debt, or incurred the obligation respecting which the suit is brought." The declaration consists of the common counts, with notice setting up the nature of plaintiff's claim.

Upon a trial on the merits before the court without a jury, the trial judge made the following findings of fact and conclusions of law:

"That in the fall of 1915, a company of Bad Axe

persons assumed to be a corporation owning a manufacturing plant and a business in the city of Bad Axe, the business of which was the manufacture and sale of a special cultivator under a patent; that the business had not flourished and was at a standstill.

"Mr. John Ryan, a stockholder, was informed by a mutual acquaintance of Mr. Woodward and his business at Clinton, Michigan. Mr. Woodward's business was the manufacture of plows and plow repairs, and for that purpose he owned a foundry and equipment. Correspondence and negotiations followed, which resulted in a reorganization of the Huron Implement Corporation with an additional capital stock, a transfer to the new corporation of Mr. Woodward's foundry, material, matters, etc., at a valuation of $10,000, Mr. Woodward receiving thereafter $10,000 in the common stock of the reorganization.

"A contract was entered into by which Mr. Woodward became manager at a salary of $125 per month for the first year and $100 the second year, with a provision for increase if the business paid a certain per cent profit.

"During these negotiations, Mr. Ryan and Mr. Pangborn visited and inspected Mr. Woodward's property at Clinton and Mr. Woodward was given a free hand at Bad Axe for investigation and to size up the prospects of making a success of the business and to investigate the assets of the business.

"Mr. Woodward assumed management of the business. A stock of completed implements and parts and unfinished implements was on hand, and Mr. Woodward devoted his attention to getting these on the market and finishing the uncompleted implements.

"In the negotiations and meetings of the stockholders of the new corporation, there seems to be no doubt that the addition of Mr. Woodward's plow business to the corporation was to be made effective by a suitable building to house it and carry on the work, and plans were formulated for the building and estimates of cost made.

"Mr. Woodward assumed management March 1, 1916. In April, three of the directors, Mr. Ryan, Mr. Fremont, and Mr. Pangborn, had a conversation with Mr. Woodward, in which they insisted that work on

the foundry building should be postponed until August. In the meantime a part of Mr. Woodward's foundry equipment had been delivered at the grounds of the company at Bad Axe, the remainder awaiting at Clinton the completion of the building. The completed cultivators were put upon the market and a salesman was employed.

"At the reorganization, cash on hand from stock subscriptions was $9,500 approximately. The indebtedness of the old corporation assumed by the new was approximately $5,500.

"About October, 1916, the bank of F. W. Hubbard & Company, of which Mr. Ryan, a director of the corporation, was manager, notified Mr. Woodward not to overdraw the Implement Company's account, which was then about exhausted. No work had been commenced on the foundry building.

"A part of the indebtedness of the old corporation, not including the $3,000 secured by the real estate, was paid by checks drawn on the funds by Mr. Rankin, cashier of the F. W. Hubbard bank, by direction of the directors of the corporation.

"About ............ 1916, Mr. Woodward, after interviews and negotiations with Mr. Ryan and the stockholders and directors in session, resigned his position of manager, tendered back his stock and brought this action.

"When the active operation of the business came to a stop, the condition of the corporation was about the same as when operations commenced, so far as indebtedness and inventory value of assets were concerned, except that the cash from the stock subscription and from the proceeds of such sales as were collected, had been invested in material and labor.

"These, I believe, are the essential and material undisputed facts. The disputed facts are:

"*First.* Mr. Woodward claims that he was misinformed in the negotiations as to the amount of floating debts, over and above that secured by the real estate, which he claims were roughly estimated at four or five hundred dollars. Mr. Ryan and Mr. Pangborn both deny this and state positively that the actual amount of debts was overstated to Mr. Woodward.

"From a preponderance of the testimony and the

circumstances, I find as a matter of fact, that the full amount of debt was communicated to Mr. Woodward before he became a stockholder.

"*Second.* A claim is made that a part of the inducement to Mr. Woodward, to close the contract for service and transfer, of his foundry equipment, was a representation or promise by influential and wealthy subscribers to the new stock, that sufficient funds would be forthcoming to finance the business and erect the foundry, and the failure of the directorate to supply funds when the cash was exhausted, is evidently, as I gather from the mass of testimony and argument, claimed to constitute a breach of contract, express or implied, upon which plaintiff relies as the fraud and tort as a basis of his suit; coupled with the claim in finding number one, as to the misrepresentations as to indebtedness.

"The testimony in this connection is in conflict, Mr. Woodward claiming that what was said was by those authorized by their positions and influence in the corporation and induced him to close the contract: The opposing testimony is in substance that the statements made were that the banks, of one of which Mr. Ryan was manager, and of the other, Mr. Sleeper was a large proprietor—both those men being stockholders in the corporation, would furnish credit if the corporation's business warranted credit.

"I find that there was no express, unconditional promise or representation by the corporation, through any one authorized to make such a promise, that more funds would be furnished than the cash capital on hand.

"*Third.* I find that Mr. Woodward was given complete authority as manager, at the start, with unrestricted use of the funds on hand, except the amount expended in settling the floating indebtedness by the checks signed by Mr. Rankin.

"*Fourth.* The cause for the instructions to postpone the commencement of building operations until August, does not appear clearly in the testimony, except that it may be inferred that the funds were being depleted and the business not satisfactory,. and that it was a precaution against further financial difficulties. Also early in the spring the ground was too wet to permit building operations.

"*Fifth.* I find that Mr. Woodward entered into this contract with as much practical knowledge as to whether it could be made a paying business as the influential stockholders. The bankruptcy proceedings were not started until after this suit was started by plaintiff.

"Conclusions of Law.

"*First.* The testimony does not warrant (and the burden of proof is not sustained by plaintiff in this respect), the conclusion that active fraud was practiced by any one in the negotiations preceding the contract, and the plaintiff's declaration disavows such active fraud.

"*Second.* Was there constructive fraud in the breach of an implied promise to continue operations and furnish funds?

"I do not think that a promise can be fairly implied, as a matter of law, to continue a business as to which the parties may have had roseate views, both the incorporators and Mr. Woodward, when conditions unforeseen, faulty management or numerous other business difficulties shall confront such an organization with financial ruin. The testimony is bare as to what was to follow the step, whether to resume after a time, sell more stock or wind up. The bankruptcy proceedings can hardly relate back to the original negotiations, nor to the stoppage of credit and operations, to give any fraudulent color to those transactions.

"*Third.* I find no ulterior intention or motive in the stoppage of credit and operations toward Mr. Woodward or his interest, no misfeasance. At most, if he should be found to have suffered a loss, it is the result of mere nonfeasance and I am not sure that mere nonfeasance can not support a tort action, and it is difficult to say that the refusal of credit and stoppage was not good business sense.

"An order will be entered on these findings, dissolving the writ of attachment, restoring the property to the defendant and assignee in bankruptcy.

"As I understand, the whole merits of the cause of action were submitted, and testimony to apply to the same, the motion to dismiss the action is sustained and an order will be entered to that effect."

A motion for a new trial was denied by the circuit

judge, who, at plaintiff's request, filed his reasons therefor in writing. Plaintiff filed exceptions to the refusal to grant a new trial and also to the court's findings of fact, on the ground that such findings are against the clear weight of evidence submitted at the trial.

It will be noted from the findings of the court that an order dissolving the writ of attachment was provided for and also that the case was decided upon its merits. Thereafter an order dissolving the attachment was entered and also a judgment of no cause of action. There is some discussion in the briefs of counsel as to whether the order dissolving the attachment is properly before us for review, but as we are constrained to come to the conclusion that the judge was clearly right, in the consideration of all the merits of the case, that there was no cause of action, it will be unnecessary for us to consider the first question suggested, because if the judgment of no cause of action stands, the writ of attachment will *ipso facto* be dissolved.

The only question that is raised which needs our consideration is whether or not the findings are against the clear weight of the evidence submitted at the trial so as to require us, under section 12587 of the Compiled Laws of 1915 (section 15, chapter 18, judicature act), to disturb the findings of the learned circuit judge upon the questions of fact. A careful reading of this record has satisfied us that this is simply one of those unfortunate adventures entered into by parties in good faith, but which, because of adverse conditions and perhaps lack of experience, does not meet the expectations of those who engaged in the enterprise and results in failure instead of the anticipated success.

The finding of the trial judge with reference to the alleged misrepresentation of the indebtedness of the

company is fully justified by the record. It was stated to plaintiff by at least three persons who had knowledge of the affairs of the company, that the indebtedness of the Huron Implement Company was $5,500, while it seems to be undisputed that this indebtedness amounted to only $5,200. The plaintiff entered into the agreement with a full knowledge of all the facts. He had at least as much knowledge of the sale and manufacture of farming implements as any other officer or stockholder of the Huron Implement Company. He was in complete charge of the affairs of the company, including the right to draw upon all the moneys in the treasury for any legitimate business of the company. He attended all the directors' meetings after he was elected director and all the stockholders' meetings that were called, and at no time did he raise any dissenting voice as to any action taken.

We are also of the opinion that the claim of plaintiff that there was fraud committed in the failure of the defendants to furnish sufficient funds to finance the business and organize the foundry is not supported by the evidence, and agree with the finding of the judge that it was not made to appear that there was any "express, unconditional promise or representation by the corporation through any one authorized to make such a promise, that more funds would be furnished than the cash capital on hand."

We are also of the opinion that the evidence fully sustains the fourth finding of fact, and that the failure to bring the Clinton plow factory to Bad Axe on the part of the directorate gives plaintiff no ground for the relief sought for. With reference to this, it appears that he did not complain until the finances of the concern were nearly exhausted, and then no attempt was made to call a meeting of the board of directors or the stockholders to take action with reference thereto.

The proofs are convincing that it was the intention of all the parties to have the business managed as profitably as possible, and, if there were any errors in judgment, that they were concurred in by the plaintiff, and no complaints were made by him until after the moneys were nearly exhausted. It is apparent that the original stockholders of the Huron Implement Company were desirous of extending the established business of that company, and it is probable that the plaintiff had it in mind also to make the Clinton plow business the paramount activity. In this they may have been acting at cross purposes, but, however that may be, the direction and management of the business was in the plaintiff's hands, he having been induced to enter into the enterprise for the very purpose of assuming the managerial duties of the company, and in the performance of these duties it does not appear that he was interfered with.

Being of the opinion, as we have stated above, that the proofs fully sustain the findings of the judge, the judgment of the court below must be affirmed.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.